IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEREK GANGLUFF,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-02583-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Derek Gangluff challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Nov. 25, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #8). For the reasons below, I **AFFIRM** the Commissioner's decision denying DIB and SSI.

## PROCEDURAL BACKGROUND

Mr. Gangluff applied for DIB and SSI on July 18, 2023, alleging he became disabled on April 1, 2022. (Tr. 231, 236). After the claims were denied initially and on reconsideration, Mr. Gangluff requested a hearing before an Administrative Law Judge. (Tr. 134, 143, 147, 165). In June 2024, Mr. Gangluff appeared without the aid of a representative and the matter was continued so he could secure representation and the ALJ could request medical records. (Tr. 74-90). On October 15, 2024, Mr. Gangluff (represented by counsel) and a vocational expert (VE)

testified before the ALJ. (Tr. 41-72). On November 21, 2024, the ALJ determined Mr. Gangluff was not disabled. (Tr. 17-35). On October 1, 2025, the Appeals Council denied the request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Mr. Gangluff timely filed this action. (ECF #1).

## Factual Background

### I. Personal and Vocational Evidence

Mr. Gangluff was 37 years old on his alleged onset date and 39 years old at the October 2024 hearing. (*See* Tr. 93, 51). He has a GED and has worked as a general inspector and a welder. (Tr. 51, 63).

### II. Medical Evidence

In June 2022, Mr. Gangluff visited the emergency room complaining of three weeks of right shoulder pain after doing landscaping work involving weed whacking and shoveling. (Tr. 340). A physical examination noted right shoulder pain with a decreased range of motion and strength, and tenderness with palpation to the right shoulder; Mr. Gangluff refused range of motion testing because of pain. (Tr. 340, 342). X-ray imaging of his right shoulder was negative. (Tr. 345). Mr. Gangluff was diagnosed with an acute rotator cuff strain, given medications and a sling, and referred to an orthopedist. (Tr. 344).

In September 2023, Mr. Gangluff went to the emergency room with a hand injury sustained while doing a construction project. (Tr. 404). X-ray imaging revealed fractures in the metacarpal bone in the palm of his right hand and old healed injuries in his pinky finger and wrist. (Tr. 406, *see also* Tr. 411-13). His hand was placed in a splint. (Tr. 409-10).

In May 2024, Mr. Gangluff began treatment with a primary-care practice. (Tr. 493). He reported a history of, among other conditions, anxiety, depression, and chronic low-back pain. (*Id.*). He described being constantly on edge, worrying about how others thought of him, disliking being in public, losing all interest in things he used to enjoy, being more irritable, feeling depressed, and believing people are constantly judging him for his tattoos and previous incarceration. (*Id.*). He also described his low-back pain with a constant feeling his back will go out or pop and he will be stuck in a particular posture. (*Id.*). He previously had chiropractic treatment with temporary relief, no relief from muscle relaxants, and some relief from over-the-counter pain relievers. (*Id.*). A physical examination noted symptoms of depression and anxiety, tenderness to palpation in the lower back, good range of motion, normal gait and balance, grossly normal strength, and normal mood, affect, and judgment. (Tr. 493-95). X-ray imaging of his lumbar spine taken later that month revealed mild multilevel degenerative changes without evidence of an acute fracture. (Tr. 450).

Mr. Gangluff followed up in June for his back pain and anxiety. (Tr. 614). A physical examination noted good range of motion, normal gait and balance, grossly normal strength, and normal mood, affect, and judgment. (Tr. 616-17). He was diagnosed with degenerative disc disease, anxiety, and depression. (Tr. 619). He was prescribed medications and referred for physical therapy and an MRI to evaluate his back pain and newly onset right-sided lumbar radiculopathy. (*See id.*). The MRI revealed mild multilevel spondylotic changes without high-grade spinal canal or foraminal narrowing at any lumbar level. (Tr. 610). The foraminal narrowing was at most moderate at the L3-L4 and L4-L5 levels and mild at the L5-S1 level. (Tr. 611).

Mr. Gangluff followed up again later in June and reported being about the same with some improvement in his anxiety. (Tr. 589-90). A physical examination again noted good range of motion, normal gait and balance, grossly normal strength, and normal mood, affect, and judgment. (Tr. 591). His physical therapy was scheduled to start in July, he was referred for a neurosurgical evaluation, and his medications were adjusted. (Tr. 594-95).

Mr. Gangluff attended twice-weekly physical therapy appointments for his back pain over July and August 2024. (*See* Tr. 567, 560, 554, 548, 542, 536, 530, 504, 691) (ordered chronologically). In the first visit, his functional limitations were checked off as:

- High pain levels and/or dependence on medication to control pain;
- Difficulty performing work;
- Difficulty sustaining static positions (sit, read, and drive);
- Disturbed sleep;
- Difficulty with activities of daily living (bathing, dressing, grooming);
- Difficulty performing prior household management tasks;
- Difficulty performing prior family care tasks; and
- Difficulty performing prior level of exercise, travel, and/or recreational activities.

(Tr. 569). The initial examination noted:

- Inability to sustain static positions during subjective questioning;
- Slow, guarded position changes;
- An antalgic, slow, and guarded gait;
- Increased frontal plane sway;
- Forward, flexed position of trunk when walking;
- End range pain and reduced range of motion when flexing, extending, and bending to either side with his lumbar spine;
- Reduced hip range of motion and 4+ and 4 out of 5 strength in his hips;
- Tenderness to palpation in both piriformis muscles and sacroiliac joints;
- Positive FABER test (for diagnosing hip, lumbar, and sacroiliac pain) and FADIR test (for diagnosing hip impingement, labral tears, or other hip dysfunctions);
- Worse pain from repeated-movement testing; and
- Limited flexibility in the hamstring and adductor bilaterally.

(*See* Tr. 569-71). The treatment notes consistently noted end-range pain with active range of motion. (*See* Tr. 560, 554, 548, 542, 536, 530, 504, 691) (ordered chronologically). Mr. Gangluff reported pain ranging from 5/10 to 10/10. (*Contrast* Tr. 548, 536 *with* Tr. 542, 530).

Mr. Gangluff returned to his primary care provider in August 2024 towards the end of his physical therapy course. (Tr. 510). He reported physical therapy provided some, but not significant, relief from his low-back pain. (*Id.*). He also reported being scheduled for a neurosurgical consultation later that month. (*Id.*). A physical examination noted similar findings to May and June: good range of motion, normal gait and balance, grossly normal strength, and normal mood, affect, and judgment. (Tr. 512; *compare* Tr. 495, 616-17, 591). Mr. Gangluff was prescribed medication and a cane for his low-back pain. (Tr. 514). He reported side effects from his psychiatric medications and did not want to continue with another. (*Id.*).

Mr. Gangluff met with the neurosurgeon on August 27 to evaluate his lumbar spondylosis and chronic low-back pain. (Tr. 659). He described occasional pain shooting down his leg and groin, much worse on the right. (Tr. 659, 660). A physical examination noted he was slow moving from sitting to standing, had trouble standing up straight, walked bent forward, and had 5/5 motor strength in both legs, decreased sensation in the right ankle and foot, significant pain with palpation of the right sacral sulcus, and reproduceable pain in the right sacroiliac joint and other diagnostic pain tests. (*Id.*). Mr. Gangluff was scheduled for an injection in his right sacroiliac joint and a series of lumbar spine and hip x-rays while continuing with physical therapy. (Tr. 660). He was also prescribed a back brace to wear when out of bed. (*Id.*).

On September 5, 2024, x-rays of Mr. Gangluff's lumbar spine showed no acute compression fracture but similar multilevel degenerative changes to the comparison imaging from

May 31, 2024. (Tr. 669; *see* Tr. 450). X-rays of his hips and pelvis did not show evidence of acute fracture, subluxation, or significant degenerative changes. (Tr. 664).

**III. Opinion Evidence**

On September 9, 2023, in connection with his disability application, Mr. Gangluff underwent a consultative physical examination with James Gatton, M.D. (Tr. 391-92). An examination noted Mr. Gangluff could get on and off the examination table unassisted and without difficulty, walked with a guarded gait without an assistive device, and had 5/5 strength in all muscles, "2+" muscle stretch reflexes, and a reduced range of motion in the lumbar spine. (*Id.*; *see also* Tr. 385-90). Dr. Gatton opined Mr. Gangluff "should be able to walk for three-to-four hours out of an eight-hour day," "could probably be on his feet for a combined total of three-to-four hours out of an eight-hour day," and "probably could carry less than 15 pounds frequently and more than 30 pounds on occasion." (Tr. 392).

On September 21, 2023, state agency medical consultant Diane Manos, M.D., reviewed Mr. Gangluff's medical records, including Dr. Gatton's opinion, and opined he can lift and carry up to 50 pounds occasionally and 25 pounds frequently; stand, walk, and sit for about 6 hours each in an 8-hour workday; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, and crawl; and must avoid all exposure to workplace hazards like machinery and unprotected heights. (Tr. 97-99, 107-09).

On September 26, 2023, in connection with his disability application, Mr. Gangluff underwent a consultative psychological examination with Taylor Groneck, Psy.D., via telehealth. (Tr. 416-22). His chief complaints were agoraphobia, that he did not "feel comfortable in public" since he was released from prison, and anxiety. (Tr. 416). Dr. Groneck noted Ms. Gangluff

described panic attacks, social anxiety, and trauma-related symptoms when he leaves home. (Tr. 418). He described:

> I don't want to be there. It's not that I can't go to the store but I can't interact with people. I feel embarrassed. The way people look at me, I feel like they're judging me because I have tattoos. And also I just don't trust people. People out here are no different than people in jail . . . they're all grimy. I don't like people [standing] behind me.

(*Id.*). Mr. Gangluff also reported an increased heart rate, feeling on edge, sweating, and wanting to escape when in public. (*Id.*). He described his typical mood as "kind of down" since he was released. (Tr. 418). Dr. Groneck noted Mr. Gangluff was quietly cooperative, fidgety, talkative, appeared anxious and mildly depressed, had a blunted affect, displayed indicators of anxiety, had poor concentration skills, and was often distracted due to anxiety. (Tr. 419-20). Dr. Groneck diagnosed social anxiety with panic attacks, unspecified trauma-related disorder, and recurrent mild major depressive disorder. (Tr. 421). Dr. Groneck opined Ms. Gangluff:

- Is not expected to have problems understanding or remembering instructions;
- When working around others, anxiety symptoms may limit his ability to work at a productive pace;
- His ability to establish productive work relationships will likely be impacted by social anxiety and trauma related symptoms; and
- Exposure to workplace pressures may exacerbate panic symptoms.

(Tr. 422).

On October 3, 2023, state agency psychological consultant Kari Kennedy, Psy.D., reviewed Mr. Gangluff's file, including Dr. Groneck's opinion. (Tr. 97, 99-100, 107, 109-10). First, Dr. Kennedy found no limitations in understanding and memory. (Tr. 99, 109). Second, Dr. Kennedy opined Mr. Gangluff was moderately limited in maintaining attention and concentration but not significantly limited in the other areas of sustaining concentration and persistence. (*Id.*). Dr. Kennedy explained Mr. Gangluff "can maintain concentration, persistence, and pace on detailed

work." (*Id.*). Third, Dr. Kennedy opined Mr. Gangluff was moderately limited in interacting appropriately with the general public and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness but was not significantly limited in the other three areas of social interaction. (Tr. 99-100, 109-10). Dr. Kennedy explained Mr. Gangluff can "interact superficially with supervisors, coworkers, and the general public." (Tr. 100, 110). Last, Dr. Kennedy found no limitations in adaption. (*Id.*).

On reconsideration review on November 3, 2023, state agency psychological consultant Janet Souder, Psy.D., found different social interaction limitations than Dr. Kennedy, namely that Mr. Gangluff is moderately limited in interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers, but not significantly limited in maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. (Tr. 120, 131). Dr. Souder's explanation was the same as Dr. Kennedy—Mr. Gangluff "can interact superficially with supervisors, coworkers, and the general public." (*Id.*). Dr. Souder otherwise affirmed Dr. Kennedy's findings. (Tr. 119-20, 130-31). On reconsideration review on December 4, 2024, state agency medical consultant W. Scott Bolz, M.D., reviewed updated medical records and affirmed Dr. Manos' findings. (Tr. 118-19, 129-30).

**IV. Testimonial Evidence**

Mr. Gangluff explained his back constantly hurts and whenever he twists or turns, he never knows when it will pop, go out, and lock his posture. (*See* Tr. 52). Sometimes his back can go out bad enough that his legs go out with it, causing him to fall and be unable to move. (*Id.*).

Physical therapy did not help his pain. (Tr. 52). Nor did muscle relaxers or a therapeutic cream. (Tr. 53). He received an injection to his sacroiliac joint about a month or two before the

hearing, but it was intended to locate the source of his pain, not treat it. (Tr. 52). His doctors did not want to prescribe pain medications before the diagnostic injection. (Tr. 53). He is scheduled for a treatment injection on October 22, a week after the hearing. (Tr. 52). The next step in treatment is to have three screws surgically placed into the joint between the hip and the spine. (*See* Tr. 52). His neurosurgeon prescribed a back brace, but it had not arrived by the time of the hearing. (Tr. 56). He was prescribed a cane and is instructed to use it whenever he is walking. (Tr. 58).

Mr. Gangluff gets anxious when he goes around a lot of other people or is in enclosed spaces. (Tr. 53, 55). He becomes paranoid and has "PTSD feeling" from being incarcerated. (Tr. 55). He will start feeling cramps and a discomfort akin to claustrophobia whenever he is in an area that is "like a facility." (Tr. 55). He is also anxious around doctors, which he described as white-coat syndrome, and that leads him to tend not to follow up. (Tr. 53). He does not like interacting with people and feels as if he will always be judged and looked at in disgust. (Tr 55).

At the close of his testimony, Mr. Gangluff, his counsel, and the ALJ had an extensive colloquy about the completeness of the record:

> ALJ: All right. I think the only other question that I want to make sure that we cover [INAUDIBLE] were quite a few of the exhibits that indicate there weas no medical source or records that were missing. Do you feel confident that we have everything?
>
> Counsel: He's got an appointment coming up, Judge, and I don't know if – you know, the last record we have from Avita that we got was what, September 5th of—
>
> ALJ: September. That seems so recent. But then, I don't know what happened with [Exhibit] 15F/ It was Avita Neurosurgery, and its referenced in the records. They have the appointment with Avita Neurosurgery. Is it kind of contained in 15F, like, or 16F–
>
> Counsel: Usually Avita—

ALJ: —did 15 go back?

Counsel: Yeah. I don't know. I don't know. Usually Avita sends everything together.

ALJ: It looked to me—

Counsel: —and I don't know.

ALJ: —like everything was in there, but I just wanted to make sure that you felt comfortable that that was okay, and then it looks like there was an Orthopedic Sports Medicine that might have gone out. So I just wanted to make sure that you didn't feel like you were missing any sources.

Counsel: That was [the state agency] that requested that, it looks like.

ALJ: Yeah.

Counsel: The ortho.

ALJ: Yes. Has most of your treatment been through Avita, Mr. Gangluff? We just want to make sure we have everything.

Mr. Gangluff: Yes. And I do know the neurosurgeon is over in the Avita in Galion.

ALJ: Okay.

Counsel: Have you seen anybody after like September 5th?

Mr. Gangluff: Yeah. I went and got my shot.

ALJ: Is that Segal?

Counsel: Was your injection at—

ALJ: —Is that the doctor?

Mr. Gangluff: Yeah, that was with Dr. Segal.

ALJ: Okay. Okay. Just looking because I have some x-rays. Have you had an MRI or anything recently that I should—

Mr. Gangluff: Oh, they had me do—yeah. So they had me do the x-rays before I got the injection.

ALJ: Okay.

Counsel: But you had an MRI in June, though, didn't you?

ALJ: June, right?

[Mr. Gangluff]: Yes. Yeah I had an MRI done in June.

ALJ: Okay. I have that. Okay.

Counsel: I thought we had the injection and a reference to it.

Mr. Gangluff: I don't know why they put preliminary and recommend right SI and joint injection, AP Segal.

Counsel: Is Segal even neurology?

Mr. Gangluff: Yeah, I believe so. They sent me to him over on Galion.

Counsel: Okay. So that is in 16F.

ALJ: See that's what I thought, but I just wanted to make sure. Yeah Okay. All right. If in your post-hearing huddle, if you come to think there might be another source out there, just, you know, let me know—

Counsel: Well, it says—

ALJ: —that there might be.

Counsel: Yeah. No, I think we—that's fine, Judge. But I think we got the injection, right, in 16F, page 13 [Tr. 660]? Sacroiliitis. It says description right sacroiliac joint injection, surgeon Segal, facility Bucyrus outpatient, dated—what's the date of this? Nine—I think that's it, the injection they're referencing. I thought that was it. Yeah I might have just—you only had one injection, right?

Mr. Gangluff: Yes, sir.

Counsel: Okay. That's got to be it then. Okay.

ALJ: Okay.

Counsel: I think we're—yeah, I think we're—other than what you've got coming up which may lead to a surgery, but I don't—I don't—

ALJ: Okay. All right. And if something comes from that appointment, and we don't have that decision out yet, let us know.

Counsel: Yeah. Sure. I'll talk to him after the hearing.

(Tr. 59-62).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do

other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(c)-(f), 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Gangluff had not engaged in substantial gainful activity since April 1, 2022, the alleged onset date. (Tr. 20). At Step Two, the ALJ identified spondylosis, obesity, anxiety, depression, and PTSD as severe impairments. (*Id.*). At Step Three, the ALJ found Mr. Gangluff's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 22-23). At Step Four, the ALJ determined Mr. Gangluff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he can never climb ladders, ropes or scaffolds or crawl, but he can occasionally climb ramps and stairs, balance, stoop, kneel and crouch. He can do no work at unprotected heights or around hazardous machinery, and he can do no commercial driving. He can never operate foot controls bilaterally. He can occasionally reach overhead bilaterally. He must avoid concentrated exposure to vibration. Mentally, the claimant is limited to simple, routine work, and he can do no work with the general public as part of his routine job duties and have occasional interaction with supervisors and coworkers. He can do no fast-paced production work such as assembly line work or work where a machine sets the pace or is of a variable rate. He can engage in occasional decision making and tolerate occasional changes in work setting. He can have no strict production, hourly requirements but he can tolerate end of day work goals. He can perform no routine job tasks with coworkers.

(Tr. 24) (cleaned up). The ALJ found Mr. Gangluff could not perform his past relevant work. (Tr. 33). At Step Five, the ALJ determined Mr. Gangluff could perform other work, including as a merchandise marker, inspector/hand packager, and routing clerk. (Tr. 34). Thus, the ALJ concluded Mr. Gangluff was not disabled. (Tr. 35).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial

evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Mr. Gangluff argues remand is warranted because the ALJ (i) improperly excluded evidence under the five-day rule and (ii) improperly analyzed the medical opinions offered by Dr. Gatton, the state agency psychological consultants, and Dr. Groneck.[1] (ECF #11 at PageID 772-73; *see also* ECF #14 at PageID 813).

---

[1] I limit my review to the particular issues that Mr. Gangluff discusses in his briefing. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006). At various points, Mr. Gangluff argues the record supports greater physical and mental limitations, the ALJ's rejection of greater limitations is unsupported by substantial evidence, the ALJ failed to comply with the requirements of Social Security Ruling 16-3p for analyzing his statements, and the ALJ failed to build an accurate and logical bridge between evidence and result. (*See* ECF #11 at PageID 776-78). But the body of Mr. Gangluff's brief fully develops only the arguments challenging the ALJ's application of the five-day rule and the ALJ's evaluation of the opinions by Dr. Gatton, the state agency psychological consultants, and Dr. Groneck. (*See id.* at PageID 774-75, 779-87; ECF #14 at PageID 813). Because the other arguments are either overlapping, alternative means of stating similar issues, or are raised only perfunctorily, I consider them waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

**I. Exclusion of evidence under the five-day rule**

First, Mr. Gangluff argues the ALJ erred in not admitting evidence under the five-day rule in 20 C.F.R. §§ 404.935 and 416.1435 after the ALJ instructed Mr. Gangluff's counsel to submit any evidence received after the hearing and the ALJ took an improperly adversarial stance. (ECF #11 at PageID 773). The Commissioner responds that Mr. Gangluff cannot identify what evidence is missing, his counsel stated the record was complete and the ALJ gave him the opportunity to submit evidence of his medical appointment after the hearing, and nothing describing that visit appears in the record. (ECF #13 at PageID 798-800). Mr. Gangluff replies it is illogical for the ALJ to decline to admit evidence if the record were complete and if anything is missing from the record before this court, that is the fault of the Commissioner who bears a duty to provide an accurate transcript. (ECF #14 at PageID 808-09).

Mr. Gangluff argues the ALJ did not provide substantial evidence to support application of the five-day rule. (ECF #11 at PageID 773). The Commissioner does not discuss the standard of review. (ECF #13 at PageID 799-800). But in a recent unpublished decision, the Sixth Circuit articulated that abuse-of-discretion review applies in social security cases that raise procedural issues like an ALJ's application of the five-day rule. *See Haight v. Comm'r of Soc. Sec.*, No. 22-1364, 2023 WL 3467042, at *1 (6th Cir. Jan. 18, 2023). There, the Sixth Circuit wrote:

> Judicial review of the Commissioner's findings of fact, as set forth in an ALJ's decision, is limited to determining whether such findings are supported by substantial evidence. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). With respect to matters of procedure, such as an ALJ's application of Section 404.935's five-day rule, our review is for an abuse of discretion. *See Smith v. Berryhill*, 139 S.Ct. 1765, 1779 n.19 (2019) (noting that the abuse-of-discretion standard applies to an ALJ's "overall conclusion" while substantial-evidence review applies to findings of fact); *Stout v. Kijakazi*, No. 20-36013, 2022 WL 445521, at *1 (9th Cir. Feb. 14, 2022) (applying abuse-of-discretion standard to the ALJ's refusal to consider evidence that was submitted in violation of § 404.935). "An abuse of discretion exists

> when the [ALJ] applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *B & G Mining, Inc. v. Dir., Off. of Workers' Comp. Programs*, 522 F.3d 657, 661 (6th Cir. 2008) (quoting *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007)).

*Id.*; *see also Gwin v. Bisignano*, No. 1:25-cv-2221, 2026 WL 2105761, at *9-10 (N.D. Ohio July 22, 2026) (applying *Haight*). The *Haight* Court further noted:

> Section 404.935 allows an ALJ to exclude untimely submissions at its discretion, so long as the submissions do not fall into one of Section 404.935(b)'s safe harbors. When an ALJ does exclude such evidence, he need not explain the decision at length; he need only give the reason for it.

2023 WL 3467042, at *2 (citations omitted).

By regulation, written evidence must be submitted to the ALJ "no later than 5 business days before the date of the scheduled hearing." 20 C.F.R. §§ 404.935(a), 416.1435(a). The ALJ "may decline to consider" evidence submitted late, subject to several exceptions. *Id.* The relevant exception here is:

> (3) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to:
>
> * * *
>
> (iv) You actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing.

*Id.* §§ 404.935(b), 416,1435(b). Mr. Gangluff argues he met this exception because his attorney diligently sought records from Avita Neurosurgery prior to his appointments in August and September 2024. (ECF #11 at PageID 774). Additionally, Mr. Gangluff had an appointment on October 22, after the administrative hearing. (*See* Tr. 52).

Mr. Gangluff criticizes the ALJ for not citing evidence to support rejecting the later-submitted evidence or identifying the evidence that was submitted. (ECF #11 at PageID 774). He

further argues this error was in violation of the Commissioner's Programs Operations Manual System (POMS). (ECF #13 at PageID 810-11).

First, any failure by the ALJ to extensively discuss the excluded evidence is not by itself a reason for remand. The Sixth Circuit observed in *Haight* that "[w]hen an ALJ does exclude such evidence, he need not explain the decision at length; he need only give the reason for it." 2023 WL 3467042, at *2. Here, the ALJ discussed the late-submitted evidence as follows:

> The claimant submitted or informed the Administrative Law Judge about additional written evidence less than five business days before the scheduled hearing date. The undersigned Administrative Law Judge declines to admit this evidence because the requirements of 20 C.F.R. 404.935(b) and 416.1435(b) are not met. The claimant did not advise the undersigned of this evidence no later than five business days before the date of the scheduled hearing, and the evidence is cumulative.

(Tr. 17). The ALJ thus gave the reason for excluding the evidence: it was cumulative. In *Gwin*, another judge in this district accepted as appropriate the ALJ's rationale that the claimant "had already been provided ample time to secure the records, and the ALJ found the evidence in the file sufficient to form the basis of his decision"—in other words, it was cumulative. *See Gwin*, 2026 WL 2105761, at *10. The ALJ's discussion here is like that in *Gwin*: both ALJs decided the late evidence was cumulative and neither separately discussed the evidence. Thus, under *Haight*, the ALJ here did not abuse her discretion by excluding the evidence as cumulative without more explanation.

Mr. Gangluff's argument that the ALJ was required to further explain his decision under the POMS does not justify remand. The POMS "is a policy and procedure manual that employees of the [Social Security Administration] use in evaluating Social Security claims." *Davis v. Sec'y of Health & Hum. Servs.*, 867 F.2d 336, 340 (6th Cir. 1989). "POMS guidelines are not legally binding on the Court and do not bind the Commissioner." *Johnson v. Comm'r of Soc. Sec.*, No. 5:21-cv-1721,

2022 WL 2612113, at *16 (N.D. Ohio Apr. 14, 2022) (discussing cases), *report and recommendation adopted*, 2022 WL 2712174 (N.D. Ohio July 13, 2022); *see also Tejada v. Apfel*, 167 F.3d 770, 775 (2d Cir. 1999) (holding POMS guidelines "do not bind the Commissioner."); *Davis*, 867 F.2d at 340 (explaining that POMS "does not have the force and effect of law" but "is nevertheless persuasive"). And "the Agency's failure to follow a POMS procedure does not give rise to a due process violation." *Selyak v. Comm'r of Soc. Sec.*, No. 1:17-cv-1627, 2018 WL 3244618, at *11 (N.D. Ohio May 22, 2018) (quotation omitted), *report and recommendation adopted,* 2018 WL 3241241 (N.D. Ohio July 3, 2018). Thus, a violation of the POMS would not justify remand.

Taking the POMS for its persuasive value, Mr. Gangluff correctly notes the ALJ should have at least identified the evidence that was submitted late and placed it in Mr. Gangluff's file even though it was not relied on. (*See* ECF #14 at PageID 810-11). But the persuasive value of the POMS violation to justify remand is quickly outweighed by the persuasive value of *Haight* and *Gwin* that, as discussed above, would accept the ALJ's explanation.

Last, Mr. Gangluff contends "the ALJ took an improper adversarial stance against Plaintiff." (ECF #7 at PageID 773). He offers no support for this assertion beyond that the ALJ declined to admit evidence. However, this assertion is belied by the transcript of the hearing. In five separate instances in the colloquy over the record, the ALJ did not act adversely to Mr. Gangluff:

> ALJ: All right. I think the only other question that I want to make sure that we cover [INAUDIBLE] were quite a few of the exhibits that indicate there was no medical source or records that were missing. Do you feel confident that we have everything?
>
> * * *
>
> ALJ: —like everything was in there, but I just wanted to make sure that you felt comfortable that that was okay, and then it looks like there was an

Orthopedic Sports Medicine that might have gone out. So I just wanted to make sure that you didn't feel like you were missing any sources.

* * *

ALJ: Yes. Has most of your treatment been through Avita, Mr. Gangluff? We just want to make sure we have everything.

* * *

ALJ: See that's what I thought, but I just wanted to make sure. Yeah Okay. All right. If in your post-hearing huddle, if you come to think there might be another source out there, just, you know, let me know—

* * *

ALJ: Okay. All right. And if something comes from that appointment, and we don't have that decision out yet, let us know.

(Tr. 59-62).

I thus decline to order remand on this basis.

## II. Analysis of the medical opinions by Dr. Gatton, the state agency psychological consultants, and Dr. Groneck

In his second assignment of error, Mr. Gangluff argues the ALJ misevaluated the medical opinions by Dr. Gatton, the state agency psychological consultants, and Dr. Groneck. (*See* ECF #11 at PageID 779-87).

A claimant's RFC is that person's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2 (July 2, 1996). The ALJ is solely responsible for assessing an individual's RFC and must base that assessment on all relevant evidence in the case record, including information about the individual's symptoms and any medical opinions from acceptable medical sources. *Id.*; *see also Coldiron v. Comm'r of Soc Sec.*, 391 F.App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a

claimant's RFC."). In reviewing medical source statements, the ALJ considers the persuasive value of the opinions in terms of their consistency with other record evidence and the supportability of the opinion—*i.e.*, the evidence and explanations the medical source cites in support of the opinion. *See* 20 C.F.R. §§ 404.1520c(b)(2), (c)(1)-(2); 416.920c(b)(2), (c)(1)-(2).

The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability, and substantial evidence supports the discussion, then the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

But the ALJ need not incorporate all opined restrictions in a medical opinion, even if the ALJ finds the opinion persuasive. *Nasser v. Comm'r of Soc. Sec.*, 598 F.Supp.3d 614, 626 (E.D. Mich. Mar. 17, 2022). And if the ALJ adopts a medical source's opined limitation, the ALJ need not do so verbatim. *See Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). But if the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the rejected opinion was not adopted. SSR 96-8p, 1996 WL 374184, at *7.

**A. The ALJ's analysis of Dr. Gatton's opinion regarding Mr. Gangluff's ability to stand and walk can be followed and substantial evidence supports the ALJ's findings.**

Mr. Gangluff argues the ALJ improperly rejected Dr. Gatton's consultative physical examination based on factually inaccurate reasoning by citing abnormal physical examination findings as unremarkable. (ECF #11 at PageID 780-83; ECF #14 at PageID 812). The Commissioner responds though the examinations were not uniformly normal, the ALJ relied on the normal findings within the examinations. (ECF #13 at PageID 802-03).

The ALJ analyzed Dr. Gatton's opinion as follows:

> On September 8, 2023, physical consultative examiner James Gatton, M.D., opined that the claimant could walk for three to four hours in an eight-hour workday and be on his feet for a combined total of three to four hours in an eight-hour workday. He determined that the claimant could carry less than 15 pounds frequently and more than 30 pounds on occasion. This opinion is partially persuasive. It is supported to a certain extent by Dr. Gratton's exam findings such as guarded gait without use of an assistive device and reduced lumbar spine range of motion. That said, his opinion of the claimant's ability to walk and be on his feet is not supported by his unremarkable findings, including normal strength, bulk, tone, sensation, reflexes and coordination, otherwise normal range of motion and negative straight leg raising. What is more, this portion of his opinion is not consistent with the other unremarkable physical findings of record as previously discussed.

(Tr. 29) (citing Tr. 495, 570, 616-17, 659).

Mr. Gangluff contends the cited treatment notes simply "do[] not contain unremarkable physical findings." (ECF #11 at PageID 780). A review of the records the ALJ cited does not confirm that assertion. The May and June 2024 physical examinations both noted remarkable findings of tenderness to palpation of the lower back but also the unremarkable findings of good range of motion, normal gait and balance, and grossly normal strength. (Tr. 495, 616-17). The July 2024 physical therapy evaluation has generally remarkable findings as it notes only problems in the checkboxes. (*See* Tr. 569-71). The August 2024 physical examination noted remarkable findings of

slow movement from sitting to standing, trouble standing up straight, walked bent forward, significant pain with palpation of the right sacral sulcus, and reproduceable pain in the right sacroiliac joint but also the unremarkable finding of 5/5 motor strength in both legs. (Tr. 659-60). Thus, these treatment notes were mixed: the July 2024 physical therapy evaluation offered the most remarkable findings, the August 2024 examination had mostly remarkable findings with an unremarkable finding, and the May and June 2024 examination had mostly unremarkable findings with one remarkable one. While substantial evidence "must take into account whatever in the record fairly detracts from its weight," *Brooks*, 531 F.App'x at 641, it is too far to say there were *no* unremarkable findings.

Mr. Gangluff also argues the ALJ cited the same evidence for the myriad remarkable findings as justifying greater limitations than the state agency medical consultants opined. (*See* ECF #11 at PageID 783-84; *see also* Tr. 29, 32 (each citing Tr. 495, 570, 616-17, 659)). To Mr. Gangluff, the ALJ mischaracterized the evidence by choosing to discuss only the normal findings to reject Dr. Gatton's opinion while discussing only the abnormal findings to reject the state agency medical consultants' opinions. (ECF #13 at PageID 813). However, the two opinions reached different conclusions about Mr. Gangluff's limitations. Here, the ALJ emphasized the findings that were contrary to Dr. Gatton and later emphasized the findings that were contrary to the state agency consultants. When faced with differing opinions, it is not inherently unreasonable for an ALJ to conclude the objective medical evidence supports greater limitations than one opinion but lesser limitations than another, particularly when the regulations require the ALJ to assess an opinion's consistency with other evidence. *See* 20 C.F.R §§ 404.1520c(c)(2), 416.920c(c)(2).

As discussed above, the treatment notes the ALJ cited had a mix of both remarkable and unremarkable findings. A reasonable mind might accept as adequate the unremarkable findings (*e.g.*, good range of motion, normal gait and balance, grossly normal strength, 5/5 motor strength in both legs) as inconsistent with Dr. Gatton's opined limitation that Mr. Gangluff can walk or be on his feet for three-to-four hours in an eight-hour workday. At the same time, a reasonable mind might accept as adequate the remarkable findings (*e.g.*, problems in physical therapy, slow movement, trouble standing up straight, walking bent forward, and significant pain in the right sacroiliac joint) as inconsistent with the state agency consultants' opinion that Mr. Gangluff can lift and carry up to 50 pounds occasionally and 25 pounds frequently or can frequently climb ramps and stairs, stoop, kneel, crouch, or crawl. Though the ALJ could have gone into greater detail in the discussing precisely how he determined the split between the two opinions, the path of the ALJ's reasoning can be traced from evidence to conclusion. *See Stacey*, 451 F.App'x at 519.

I thus decline to order remand under this basis.

**B. Any error by the ALJ using, without explanation, occasional interactions in the RFC instead of the superficial interactions opined by the state agency consultants is harmless because there is no indication the different limitations would change the finding at Step Five.**

Mr. Gangluff contends the ALJ failed to explain why the RFC omitted the state agency consultants' opined limitation to superficial interaction but instead limits Mr. Gangluff to no work with the general public and occasional interaction with supervisors and coworkers. (ECF #11 at PageID 784-86). He contends that "superficial" interaction is not the same as "occasional" interaction because "'superficial interaction is an additional limitation to the interaction needing to be occasional and brief. And as this Court has previously made clear, occasional interaction (a quantitative limitation) does not account for a limitation to superficial interaction (a qualitative

limitation).'" (*Id.* at PageID 785) (quoting *Wylds v. Comm'r of Soc. Sec.*, No. 3:21-cv-365, 2022 WL 1541928, at *9 (N.D. Ohio Mar. 2, 2022), *report and recommendation adopted,* 2022 WL 1539266 (N.D. Ohio May 16, 2022)). Mr. Gangluff argues remand is required for the ALJ to provide a rationale for rejecting the superficial limitation. (ECF #11 at PageID 785).

The ALJ need not incorporate all opined restrictions in a persuasive medical opinion or adopt them verbatim. *See Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). But, as Mr. Gangluff correctly notes, where an ALJ determines a medical source opinion is persuasive, the ALJ must incorporate the limitation in that finding or provide a sufficient explanation for declining to do so. (ECF #11 at PageID 785) (citing *Schunn v. Comm'r of Soc. Sec.*, No. 1:20-cv-1779, 2021 WL 5868454, at *14 (N.D. Ohio Nov. 10, 2021), *report and recommendation adopted,* 2021 WL 5866990 (N.D. Ohio Dec. 9, 2021)). Thus the ALJ must explain why the rejected opinion was not adopted if the RFC assessment conflicts with an opinion from a medical source. *See* SSR 96-8p, 1996 WL 374184, at *7.

Mr. Gangluff's argument overstates the law on limitations to occasional versus superficial interactions. Far from being clear, the district courts in this circuit have split on whether limitations to superficial or occasional interaction sufficiently conflict such that the ALJ must explain why one was chosen over the other. Some district courts have found the restrictions differ from one another and "have adopted a fixed vocational definition of 'superficial interaction,' and 'presumed' that this definition is 'qualitatively inconsistent with occasional' interactions." *Stephen D. v. Comm'r of Soc. Sec.*, No. 1:21-cv-746, 2023 WL 4991918, at *6-8 (S.D. Ohio Aug. 4, 2023) (collecting cases), *report and recommendation adopted*, 734 F.Supp.3d 729 (S.D. Ohio May 16, 2024). The courts adopting this line of reasoning define "occasional" as limiting the quantity of time

spent interacting and "superficial" as limiting the quality of those interactions. *See, e.g.*, *Hutton v. Comm'r of Soc. Sec.*, No. 2:20-cv-339, 2020 WL 3866855, at *4-5 (S.D. Ohio July 9, 2020), *report and recommendation adopted*, 2020 WL 4334920 (S.D. Ohio July 28, 2020); *Lindsey v. Comm'r of Soc. Sec.*, 2:18-cv-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018), *report and recommendation adopted*, 2019 WL 133177 (S.D. Ohio Jan 8, 2019). They reason that because the terms are defined differently, an ALJ must explain why she translated an opined "superficial interaction" limitation into "occasional interaction" in the RFC. *See Stephen D.*, 2023 WL 4991918, at *6-8 (compiling cases). Accordingly, because "'superficial interaction' is a well-recognized, work-related limitation," these courts have concluded that an ALJ's explanation that he declined to adopt such a limitation because "superficial" is vocationally vague or not a vocationally relevant term is insufficient. *Hutton*, 2020 WL 3866855, at *5; *see also Stephen D.*, 2023 WL 4991918, at *6-8 (collecting cases). In a recent unpublished decision, the Sixth Circuit did not directly address whether a limitation to superficial interaction is distinct from one to occasional interaction, but did accept under the law-of-the-case doctrine that they were distinct and so affirmed the ALJ's further defining what makes an interaction "superficial." *See Mabry-Schlicher v. Comm'r of Soc. Sec.*, No. 24-3811, 2025 WL 1604376, at *4-5 (6th Cir. June 6, 2025).

Other courts have relied on the Sixth Circuit's seeming rejection of the argument that a limitation to "occasional interaction with the public" is inconsistent with an opinion the claimant was "able to relate to a few familiar others on a superficial basis." *See Reeves*, 618 F.App'x at 275; *see also Roberts v. Comm'r of Soc. Sec.*, No. 4:25-cv-764, 2026 WL 1551700, at *13 (N.D. Ohio June 2, 2026). They reason the terms "occasional" and "superficial" are not sufficiently conflicting because "time-limited 'occasional' interactions in an unskilled work setting are reasonably understood to

require only surface-level interactions." *Stephen D.*, 734 F.Supp.3d at 738; *see also Metz v. Kijakazi,* No. 1:20-cv-2202, 2022 WL 4465699, at *9-10 (N.D. Ohio Sept. 26, 2022).

The Commissioner, for his part, does not address this issue at all, instead declaring without explanation that "the ALJ reasonably found the evidence supported 'occasional' interactions and not 'superficial' interactions" and dismissing the argument as Mr. Gangluff's mere disagreement with the ALJ's RFC. (*See* ECF #13 at PageID 804-05).

Here, it is not necessary to decide whether limitations to occasional interactions or superficial interactions sufficiently conflict with one another to require explanation because even if they do, any error by the ALJ in choosing one term over the other would be harmless. A court will not uphold the ALJ's decision when the Commissioner failed to apply proper legal standards unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally . . . we review decisions of administrative agencies for harmless error."). Courts presented with this error have generally applied the normal harmless-error standard, with some finding the error harmless and some not. *See Stephen D.*, 734 F.Supp.3d at 743 (finding error harmless); *Metz*, 2022 WL 4465699, at *10 (same); *but see Hutton*, 2020 WL 3866855, at *5 (finding error harmful).

Here, Mr. Gangluff has not shown how he was prejudiced by the RFC containing a limitation to occasional interaction over superficial interaction. He contends there is a difference between the two limitations (quantitative versus qualitative) but does not set out how he was prejudiced by being limited to an occasional quantity of interaction instead of superficial quality

interactions. (*See* ECF #11 at PageID 784-86). The error could have been harmful if the ALJ may have intended to present a different hypothetical to the VE and thus the ALJ may have reached a different conclusion at Step Five. *See Metz,* 2022 WL 4465699, at *9; *Hutton*, 2020 WL 3866855, at *5. But the ALJ explained in the hearing that she intended the hypothetical to include the limitation to occasional interactions and not superficial interactions:

> Contemplating mental health aspects in agreement with the state agency, no limitation to understanding, moderate limitation to social interaction, moderate adoption, mild limitation to adaption. We'll take a look at translate [*sic*] the social interaction, though sometimes the state agency can kind of ask for consideration of like a brief or superficial interaction. We know that that is not a *Dictionary of Occupational Titles* term, so we're going to translate that to more work-related limitation work environment. Instead, we're going to restrict to no work with the general public as part of the routine job duties using the *DOT* definition of occasional interaction with coworkers and supervisors. That's also both from the physical perspective, as well as social interaction. No routine job tasks with coworkers and supervisors.

(Tr. 64). Though this explanation was not included in the ALJ's written decision, it strongly suggests that the ALJ would present the same hypotheticals to the VE and thus receive the same jobs to substantiate the finding at Step Five.

Looking at the representative jobs on which the ALJ relied, Mr. Gangluff has not shown how those jobs "could be performed by someone who can handle 'occasional interactions,' but could not be performed by someone who can only handle 'superficial interactions' (to the extent that there is, as claimant argues, a difference between the two)." *See Stephen D.*, 734 F.Supp.3d at 743. At Step Five, the ALJ cited merchandise marker, inspector/hand packager, and routing clerk as representative jobs that could be performed with Mr. Gangluff's RFC. (Tr. 34). The *Dictionary of Occupational Titles* sets out a merchandise marker as one who marks price stickers onto merchandise. *See Merchandise Marker*, #209.587-034, *Dictionary of Occupational Titles*,

http://occupationalinfo.org/20/209587034.html (last accessed Oct. 28, 2026). An inspector/hand packager inspects products for defects and packs inspected products into shipping cartons. *See Inspector/Hand Packager*, #559.687-074, *Dictionary of Occupational Titles*, http://occupationalinfo.org/55/559687074.html (last accessed Oct. 28, 2026). A routing clerk sorts bundles, boxes, or lots of articles for delivery. *See Routing Clerk*, #222.687-022, *Dictionary of Occupational Titles*, http://occupationalinfo.org/22/222687022.html (last accessed Oct. 28, 2026). Thus, even if the ALJ erred in not explaining why the RFC limits Mr. Gangluff to occasional interactions instead of superficial interactions, he has not shown how he could not perform those representative jobs with only superficial interactions.

I thus decline to order remand under this basis.

### C. The ALJ properly rejected Dr. Groneck's opined limitations as vague

Mr. Gangluff next argues the ALJ did not explain why (i) Dr. Groneck's opined limitations were unsupported by or inconsistent with the record, and (ii) the RFC omitted opined limitations regarding concentration, working around others, and dealing with stress in a work environment. (ECF #11 at PageID 786). The Commissioner responds the ALJ rejected those limitations as vague. (ECF #13 at PageID 806).

The ALJ analyzed Dr. Groneck's opinion as follows:

> On September 26, 2023, psychological consultative examiner Taylor Groneck, Psy.D., opined that the claimant would have no problems with understanding and remembering job instructions. [She] determined that the claimant's anxiety and depressive symptoms could impact his concentration skills in the workplace, and anxiety symptoms may limit his ability to work at a productive pace. [She] indicated that the claimant's social anxiety and trauma related symptoms could impact his ability to establish productive work relationships. [She] concluded that exposure to workplace pressures may exacerbate panic symptoms. This opinion is of some persuasive value. Initially, the undersigned notes that Dr. Groneck's use of phrases, such as "could impact" and "may limit" are not vocationally defined, and, thus, does

> not adequately articulate the limitations for use in the claimant's residual functional capacity. That said, the opinion is supported to some extent by findings of anxious and mildly depressed presentation, display of anxiety indicators such as appearing on edge, laughing nervously and appearing to sweat, fidgety posture, tense facial expression, variable eye contact, limited energy level, talkative speech, distraction during conversation and often becoming derailed, apparently due to anxiety, poor concentration skills and inability to identify a similarity. It is also somewhat consistent with the claimant's reported depressive and anxious symptoms in addition to symptoms related to past trauma. What is more, it is consistent to some extent with other remarkable mental status findings of record as discussed above. However, Dr. Groneck's normal mental status findings, other unremarkable mental status findings of record and the claimant's reported activities of daily living support that the claimant's mental impairments and resulting symptoms can be accounted for in his mental residual functional capacity.

(Tr. 29) (citations omitted).

Mr. Gangluff's argument contends the evidence the ALJ cited was not inconsistent with Dr. Groneck's opinions regarding Mr. Gangluff's abilities to concentrate, work around others, and manage workplace stress. (ECF #11 at PageID 787). But the key finding regarding those opinions is the ALJ's determination that "Dr. Groneck's use of phrases, such as 'could impact' and 'may limit' are not vocationally defined, and, thus, does not adequately articulate the limitations for use in the claimant's" RFC. (Tr. 29). The vagueness of a medical opinion is a valid factor on which the ALJ may rely in assessing supportability and consistency. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F.App'x 422, 434 (6th Cir. 2018) (affirming the ALJ's conclusion where discounted opinion was "quite vague"); *Katelyn M. v. Comm'r of Soc. Sec.*, No. 2:23-cv-12276, 2024 WL 4124675, at *10 (E.D. Mich. Sept. 9, 2024) ("[A]n ALJ can properly discount the weight of an expert opinion when it is too vague and does not support specific functional limitations."). District courts in the Sixth Circuit have determined a medical opinion is vague when it does not propose specific functional limitations. *See, e.g., Hollis v. Comm'r of Soc. Sec.*, No. 1:25-cv-867, 2026 WL 41113, at *11 (N.D.

Ohio Jan. 7, 2026), *report and recommendation adopted,* 2026 WL 243912 (N.D. Ohio Jan. 29, 2026).

In the three limitations Mr. Gangluff raises, Dr. Groneck used equivocating, non-definitive phrases. Regarding Mr. Gangluff's concentration, Dr. Groneck opined his "depressive and anxiety symptoms, including feeling on edge, low energy, and nervousness around other people *will likely impact* concentration skills in the workplace." (Tr. 422) (emphasis added). Regarding working around others, Dr. Groneck opined Mr. Gangluff's "ability to establish productive work relationships *will likely be impacted* by social anxiety and trauma related symptoms." (*Id.*) (emphasis added). Regarding with managing work stress, Dr. Groneck opined "[a]t this time, exposure to workplace pressures *may exacerbate* panic symptoms." (*Id.*) (emphasis added).

While terms such as "will likely impact" and "may exacerbate symptoms" can convey meaning in ordinary parlance, they are vague in the context of a medical source opining to a social security claimant's specific functional limitations. *See, e.g.*, *Hollis*, 2026 WL 41113, at *11 (finding opinion that "depression would limit [the claimant's] ability to maintain attention and concentration" to be vague); *Von Boeselager v. Comm'r of Soc. Sec.*, No. 1:25-cv-1018, 2026 WL 959224, 2026 WL 959224, at *5, *12 (N.D. Ohio Apr. 9, 2026) (same for "would limit [the claimant's] ability to maintain attention and concentration" and "adjustment levels are likely to deteriorate under the pressures of a normal work setting"); *Lee Ann P. v. Comm'r of Soc. Sec.*, No. 1:24-cv-363, 2025 WL 2490385, at *4 (S.D. Ohio Aug. 29, 2025) (same for opinion the claimant's impairments "may" cause limitations), *report and recommendation adopted,* 2026 WL 874050 (S.D. Ohio Mar. 31, 2026). Thus, the ALJ properly rejected as vague Dr. Groneck's

opinions regarding Mr. Gangluff's abilities to concentrate, work around others, and manage workplace stress.

I thus decline to order remand under this basis.

## CONCLUSION

After review of the record, the parties' arguments, and the law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: November 4, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE